## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

               Plaintiff,

v.

James Alex Cesario, II,

               Defendant.

Case No. 14-cr-92(1) (PJS/TNL)

**REPORT &
RECOMMENDATION**

---

Benjamin Bejar, Assistant United States Attorney, United States Attorney's Office, 316 North Robert Street, Suite 404, St. Paul, MN 55101; and John R. Marti, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

James S. Becker, Assistant Federal Defender, Officer of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

---

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Pretrial Motion to Suppress Statements (Motion to Suppress Stmts., ECF No. 22) and Defendant's Pretrial Motion to Suppress Fruits of Unlawful Arrest and Search and Seizure (Mot. to Suppress Fruits of Search, ECF No. 23). These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Patrick J. Schiltz, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1(a)(3).

A hearing was held on May 13, 2014. Assistant United States Attorney Benjamin Bejar appeared on behalf of the United States of America (the Government). Assistant Federal Defender James S. Becker appeared on behalf of Defendant. Post-hearing

briefing on these motions is now complete and they are ripe for a determination by the Court.

## I.

Based upon the file and documents contained therein, along with the testimony presented, the undersigned Magistrate Judge makes the following:

### FINDINGS

The instant matter arises out of a narcotics investigation which took place in or around the summer and fall of 2013.  (Tr. at 23, 27-35, ECF No. 30.)  Detective Heather Olson, a licensed peace officer with the City of Minnetonka for the last eight years, was one of the lead investigators.  (*Id.* at 20, 21, 22.)  Detective Olson has also been part of the Southwest Hennepin Drug Trask Force for approximately one and one-half years. (*Id.* at 21.)  Her duties include the investigation of narcotics trafficking and possession. (*Id.* at 21, 22.)  In connection with these duties, Detective Olson has become familiar with different types of narcotics and "taken many classes" related to narcotics identification.  (*Id.* at 21.)  Detective Olson's training and experience also involves "illegal weapons possession" as such possession "usually . . . go[es] hand-in-hand" with narcotics trafficking.  (*Id.* at 22.)

When Detective Olson began investigating Defendant for trafficking of methamphetamine, she looked into Defendant's criminal background.  (*Id.*)  Detective Olson found several felony convictions, including controlled-substance offenses, illegal-weapons-possession offenses, possession of stolen property, and attempted second-degree

murder, as well as charges for drug trafficking.  (*Id.* at 22-23, 54, 60.)  Detective Olson also learned that Defendant was affiliated with two motorcycle gangs.  (*Id.* at 23.)

In June or July, Detective Olson learned that Defendant was living in St. Paul, Minnesota, and believed to be selling methamphetamine from his residence, and was also in possession of a handgun.  (*Id.* at 24.)  Detective Olson used a confidential informant to do a controlled buy of methamphetamine from Defendant at his St. Paul residence.  (*Id.*)  Following the controlled buy, Detective Olson drafted and obtained a search warrant for the residence, which was executed on July 18, 2013.  (*Id.* at 24-25, 27-28, 29; Ex. 1.)

The search of the residence revealed, among other things, "a large amount" of "approximately 100[%] pure" methamphetamine; a stolen, loaded handgun; two loaded magazines for the handgun; and approximately $7,000 in cash.  (Tr. at 25; *see also* Ex. 1.)  Drug paraphernalia was also found throughout the residence, including needles, pipes, scales, and baggies.  (Tr. at 25; *see also* Ex. 1.)

Additionally, search warrants were obtained for the vehicle that Defendant was stopped in while driving away from the residence (a silver Chevrolet K1500) and a buccal swab from Defendant.  (Exs. 2, 3.)  Defendant was arrested and subsequently released.  (Tr. at 30.)

In November, Detective Olson received additional information regarding Defendant's alleged narcotics trafficking.  (*Id.*)  The same informant told Detective Olson that Defendant "was again selling methamphetamine and in possession of a machine or assault rifle type gun."  (*Id.* at 30, 33, 50.)  This time, Defendant was selling methamphetamine out of a hotel room.  (*Id.* at 31.)  An officer with another metro area

3

task force also told Detective Olson that one of his confidential informants told him that Defendant was selling methamphetamine.  (*Id.* at 30.)

Detective Olson obtained a "rent roll" from the hotel, "something provided [by] the hotel stating who is renting out rooms in the hotel," and confirmed that Defendant was in fact renting a room at the hotel for an extended period of time.  (*Id.* at 31, 32.) Detective Olson then contacted another officer, who had a canine partner trained to sniff for narcotics.  (*Id.* at 31, 32.)  Detective Olson had the dog sniff the door of Defendant's room and the dog alerted positively for the presence of narcotics.  (*Id.* at 31, 32.)

After the positive alert, Detective Olson obtained one warrant to search the hotel room and one to search Defendant's person.  (*Id.* at 32, 34; Exs. 4, 5.)  Detective Olson sought a "no-knock"/unannounced nighttime warrant to search the hotel room based on Defendant's violent criminal history and weapons offenses as well as the handgun and methamphetamine found in the search of his St. Paul residence.  (*Id.* at 32-33; *see also* Ex. 4.)  Detective Olson was also concerned about the safety of other hotel patrons and the officers executing the search warrant.  (*Id.* at 33.)

Detective Olson testified that she had some continuing contact with Defendant since July and had a cell-phone number for Defendant.  (*Id.* at 34.)  Detective Olson testified that

> [p]rior to the execution of the search warrant, it was determined that for the safety of the officers and residents or people staying at the hotel, the safest way to execute th[e] warrant would be to make a phone call to [Defendant] and ask him to meet in a safe location outside of the hotel room while surveillance was following to make sure that [Defendant]

4

would . . . meet [her] in a safe location outside of the hotel
room.

(*Id.* at 34-35.)

Detective Olson contacted Defendant and he agreed to meet her in a park nearby. (*Id.* at 35, 54.)   Shortly after the call, officers conducting surveillance of Defendant observed him leave the hotel room carrying a black duffle bag and a computer bag out to his vehicle, a black Ford Focus registered to him.   (*Id.*)   The duffle bag was bulky and appeared heavy; Defendant "was carrying it kind of slouched over, kind of compensating for a large amount of weight."   (*Id.*)   Defendant placed the bags in his trunk and drove to the park.   (*Id.* at 36.)

Detective Olson, Sergeant Brady Sweitzer, and a Dakota County sheriff's deputy met Defendant in the park.   (*Id.* at 36, 37.)   Detective Olson and Sergeant Sweitzer were in plainclothes and the deputy was in uniform.   (*Id.* at 37.)   The three of them approached Defendant, who was seated in the park.   (*Id.* at 36, 37, 38.)   Detective Olson and Sergeant Sweitzer informed Defendant that search warrants would be executed on his hotel room and his person.   (*Id.* at 38, 47; *see also id.* at 55.)   Defendant was then handcuffed.   (*Id.* at 46; *see also id.* at 58.)   The officers asked who was in the hotel room and Defendant explained that his girlfriend was also in the hotel room and that she was on her way to meet them in the park.   (*Id.* at 38; *see also id.* at 46, 60.)   Given the pending search of the hotel room and Defendant's violent past, weapons offenses, and gang affiliations as well as the loaded handgun found during the prior search of Defendant's residence, the officers were concerned for the safety of the people in and around the hotel and the

5

officers who would be entering Defendant's room to execute the warrant.  (*Id.* at 39; *see also id.* at 46.)  The officers asked Defendant if there were "any weapons or anything that we need to be aware of or drugs inside the hotel room."  (*Id.*; *see also id.* at 46, 59, 60.)  Defendant responded, "No, everything is in my car," and "sa[id] that he knew something was up."  (*Id.*; *see also id.* at 40, 46, 59, 60.)

Defendant was searched, and placed in Detective Olson's vehicle.  (*Id.* at 40, 56.)  The officers found approximately $400, some keys, a bank statement, and some cell phones on Defendant's person.  (*Id.* at 40; *see also* Ex. 5.)  Defendant was later transferred to Sergeant Schweitzer's vehicle because he was "upset" with Detective Olson and "did not want to be in the vehicle with her."  (Tr. at 56.)

The officers also asked Defendant where his car was.  (*Id.* at 41.)  Defendant "kind of pointed in the direction he had walked from and kind of alluded to it being by his mother's house."  (*Id.* at 41; *see also id.* at 57.)  The officers "researched where his address on his driver's license and his mother's house is, which was probably a mile, less than a mile away from the park."  (*Id.*)  The officers found the black Ford Focus registered to Defendant parked on the street "within walking distance to [Defendant's] mother's house."  (*Id.*)  The vehicle was subsequently impounded.  (*Id.* at 41, 42.)

The search warrant was executed on the hotel room.  (*Id.* at 42.)  Among other things, officers found two vials suspected to be anabolic steroids and a receipt for a handgun sight.  (*Id.* at 42; *see also* Ex. 4.)

Detective Olson also obtained a search warrant for the black Ford Focus.  (Tr. at 43; Ex. 6.)  Inside the vehicle, officers found, among other things, an A-15 .223 assault

rifle along with four loaded magazines; a loaded .45 handgun with a round in the chamber; approximately 26 grams of "over 90[%] pure" methamphetamine; and drug paraphernalia, including baggies, scales, and needles. (Tr. at 43; Ex. 6.) The items were all found in the trunk of the vehicle. (Tr. at 44.) The assault rifle and handgun were in the same black duffle bag officers had observed Defendant placing into his vehicle at the hotel and the methamphetamine was found in the computer bag. (*Id.*)

Detective Olson and Sergeant Sweitzer later met with Defendant at the Dakota County jail for purposes of taking a statement. (*Id.*) Defendant told the officers that "there was no reason to give a statement" and Detective Olson should have known he was not going to give a statement. (*Id.* at 45.) Defendant was subsequently read his *Miranda* rights. (*Id.*)

## II.

Based upon the foregoing Findings, the undersigned makes the following:

## CONCLUSIONS OF LAW

### A. Suppression of Statements

Defendant moves to suppress "all statements, admissions[,] and answers [he] made . . . prior to, at the time of, or subsequent to his arrest." (Mot. to Suppress Stmts. at 1.) In his motion, Defendant asserts that he was not properly advised of his *Miranda* rights, the statements were not freely and voluntarily given, and the statements "were the fruits of an unlawful arrest." (*Id.* at 1-2.) Defendant also states in his motion: "More specifically, discovery received so far indicates that [Defendant] was interviewed at the Dakota County jail on November 14, 2013, by two members of law enforcement." (*Id.* at 2-3.)

In his post-hearing memorandum, however, Defendant only refers to and argues for the suppression of statements made at the park the day before on the basis that the public-safety exception does not apply.  (*See* Def.'s Mem. in Supp. at 2-5, ECF No. 31.)

### 1.  Statements at Issue

Although Defendant specifically referenced the jail statements in his motion, the record indicates that Defendant has abandoned his challenge to these statements. Notably, the Government's consolidated response prior to the hearing stated that the Government "will not use, it its case-in-chief, any statements made by [Defendant] to investigators at the Dakota County jail on November 14, 2013, but reserves the right to use any such statements as impeachment."  (Gov't's Consol. Resp. at 15, ECF No. 26.) At the hearing, defense counsel told the Court:  "I would also want to clarify that although the Government asked a series of questions regarding the interview the day following [Defendant's] arrest, they have already represented in their written submissions that they are not planning on using that statement in their case-in-chief." (Tr. at 62.)  The Government confirmed its prior representation: "Your Honor, it's true that the Government has represented in its Response that the Government does not plan on using the statement at the Dakota County Jail in its case-in-chief.  The Government is reserving its right to use it as impeachment at trial should [Defendant] testify at trial."  (*Id.*) Defendant's post-hearing memorandum states that it is "in support of his pretrial motion to suppress the use of a statement given . . . on *November 13, 2013*," and, as stated above, only discusses those statements made in the park.  (Def.'s Mem. in Supp. at 1 (emphasis added); *see also id.* at 2-3.)

Based on the foregoing, the Court recommends that Defendant's motion to suppress be denied as moot with respect to the statements taken at the Dakota County jail, and will now turn to the statements made in the park.

### 2.  Statements in the Park

Defendant's post-hearing memorandum largely anticipates the Government's argument for application of the public-safety exception to the statements Defendant made to Detective Olson and Sergeant Sweitzer at the park concerning the presence of weapons or drugs in the hotel and contends that the exception should not apply here.  (*Id.* at 2-3.)

As an initial matter, there seems to be no contention by the Government that a *Miranda* warning was not otherwise required.  "Officers must provide *Miranda* warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements.'"  *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (quoting *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2401 (2011) (internal quotation marks omitted)).  Defendant was handcuffed at the time the officers asked about the presence of weapons or drugs and it was clear that he was not free to leave.  The Government also does not contest that the questions posed were reasonably likely to elicit an incriminating response from Defendant.  *See United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) ("Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect." (quotation omitted)).

"In *New York v. Quarles*, 467 U.S. 649 (1984), the United States Supreme Court established an exception to the *Miranda* advisory requirement when 'police officers ask questions reasonably prompted by a concern for public safety.'" *United States v. Molina-Tepozteco*, No. 07-cr-181 (PJS/SRN), 2007 WL 3023292, at *4 (D. Minn. Oct. 12, 2007) (quoting *Quarles*, 467 U.S. at 656). "In this context, the protection of the public safety includes protection of the police officers themselves. The exception does not depend upon the subjective motivation of the questioning officers." *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008) (citation omitted). The Eighth Circuit has "recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient basis to ask a suspect who has been *arrested* and *secured* whether there are weapons or contraband in a car or apartment that the police are about to search." *Id.* at 1009-10 (emphasis added).

Detective Olson testified that she and Sergeant Sweitzer were concerned for the safety of the officers who were about to execute the search warrant on the hotel room and the other people in and around the hotel based on Defendant's violent past, weapons offenses, and gang affiliations, as well as the loaded handgun previously found at Defendant's residence. The Court finds Detective Olson's testimony credible.

Objectively, Detective Olson received information that Defendant had a "machine gun or assault rifle type gun" at the hotel. (Tr. at 30.) She could not be sure whether Defendant had taken the gun with him when he left the hotel. *See United States v. Williams*, 181 F.3d 945, 954 (8th Cir. 1999) (applying public-safety exception when defendant had history of weapons possession and "officers could not have known

10

whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way"). "The fact that [Defendant's Olson] question was also broad enough to elicit other information does not prevent application of the public safety exception when safety [is] at issue." *Id.* at 953 n.13. She also knew that Defendant had a violent past and gang affiliation and a stolen, loaded handgun had been found at his residence back in June. *See United States v. Noonan*, 745 F.3d 934, 938 (8th Cir. 2014) (defendant's response to pointed question about danger known by officer to be associated with defendant fell under public-safety exception); *United States v. Luker*, 395 F.3d 830, 833-34 (8th Cir. 2005) ("The officers were aware of Luker's history of methamphetamine use and were concerned about needles or substances associated with such use in the car and thus the question concerning the contents of the vehicle was warranted."). Further, the officers were aware that at least one other person had been in the hotel room with Defendant just before he left to meet them in the park. *See United States v. Everman*, 528 F.3d 570, 572 (8th Cir. 2008) ("[W]e have held that the danger posed by the possibility that other persons were present or might arrive during the event can support the application of the public safety exception." (citing *Williams*, 181 F.3d at 953-54)); *cf. Molina-Tepozteco*, 2007 WL 3023292, at *5-6 (public-safety exception did not apply to officer's inquiry of whether there were guns in the house that officer should know about when questioning occurred after area had already been secured by SWAT team).

Defendant argues that if the only information Detective Olson had regarding Defendant was a "criminal history, specifically history involving weapons possession and

violence and suspected gang affiliation," then the public-safety exception "might apply." (Def.'s Mem. in Supp. at 2.)  Defendant asserts that Detective Olson, however, knew much more about him and his circumstances at the time and that he was personally known to her for at least the past five months, and that these facts "undermine the [G]overnment's reliance" on the public-safety exception.  (*Id.*)  But, as the Government points out, "police familiarity with the defendant and his criminal history and background *support* rather than *defeat* the application of the public-safety exception."  (Gov't's Mem. in Opp'n at 4, ECF No. 33.)  *See Noonan*, 745 F.3d at 938; *Luker*, 395 F.3d at 833-34. Moreover, while Defendant appears to assert that Detective Olson's previous interactions with Defendant had been uneventful, "arresting officers are not required to assume that their encounter with suspects will remain nonconfrontational throughout the duration of the event."  *Everman*, 528 F.3d at 572.  Fundamentally, the encounter between Defendant and Detective Olson was not a friendly one.  Defendant knew Detective Olson was a law-enforcement officer investigating Defendant for narcotics trafficking; Detective Olson knew of Defendant's violent past and had received a tip that he was in possession of an assault rifle.

Defendant also argues that any threat to law enforcement had essentially been removed by Defendant leaving the hotel room and taking things out of the room in bags. (Def.'s Mem. in Supp. at 3.)  But the public-safety exception applies to areas that law enforcement is *about to search*.  *Liddell*, 517 F.3d at 1010.  The fact that Defendant was secured at one location does not diminish the concern for the officers executing the search warrant at another location.  Law enforcement did not know what Defendant took

out of the hotel room and what (and/or who) remained.  Thus, contrary to Defendant's argument, Detective Olson was not restricted to asking about "possibly dangerous materials on his person."  (Def.'s Mem. in Supp. at 3.)  In *Liddell*, the Eighth Circuit expressly recognized that "a sufficient public safety basis" still exists to inquire regarding an area about to be searched *after* "a suspect . . . has been arrested and secured."  517 F.3d at 1010.

Lastly, Defendant asserts that, because Detective Olson could not remember precisely what Defendant said in response to the officers' questions concerning the presence of weapons or drugs in the hotel, there is "confusion as to the actual statement that the [G]overnment hopes to use at trial."  (Def.'s Mem. in Supp. at 4.)  Defendant argues that "[s]ince the [G]overnment's own testifying witness is unclear about the actual statement given by [Defendant], . . . the [G]overnment has failed in its showing before the Court."  (*Id.* at 5.)  First, there is no magic formula for public-safety inquires.  *See Williams*, 181 F.3d at 953 n.13.  Second, the public-safety exception does not depend on any subjective motivation of the officer.  *Liddell*, 517 F.3d at 1009.  Third, the Court agrees with the Government that "[w]hat [D]efendant precisely said is a question for the fact-finder at trial" and the application of the public-safety exception does not turn on the exact words or statements of a defendant's response to an officer's valid inquiry based on a concern for public safety.  (Gov't Mem. in Opp'n at 5.)

For the reasons stated above, the Court finds that Detective Olson and Sergeant Sweitzer had an objective, reasonable concern for public safety, including the safety of the officers executing the hotel-room search warrant as well as occupants of the hotel,

when they inquired of Defendant at the park.[1]   Therefore, the Court recommends that

Defendant's motion to suppress the statements he made in response to that inquiry be

denied.

## B.  Whether the Warrants are Supported by Probable Cause

Defendant also moves to suppress any and all evidence obtained from the buccal

swab and the searches of his St. Paul residence, hotel room, silver Chevrolet, and black

Ford Focus.  (Mot. to Suppress Fruits of Search at 1.)  Defendant asserts that each of

these warrants lacked sufficient probable cause.  (*Id.*)   At the hearing, Defendant

confirmed that his motion seeks a "four-corners" analysis of the warrants "to determine

whether or not there was sufficient information contained therein to support a finding of

probable cause."  (Tr. at 62; *see also* Def.'s Mem. in Supp. at 1.)  The Government

responds that "a fair and common-sense reading within the four corners of each affidavit

shows that the issuing magistrate had a substantial basis to find probable cause to issue

the warrants, [and D]efendant's motion to suppress should be denied."  (Gov't Consol.

Resp. at 17; *see also* Gov't's Mem. in Opp'n at 1.)

"The Fourth Amendment requires that search warrants be supported by probable

cause."  *United States v. Tripp*, 370 Fed. App'x 753, 757 (8th Cir. 2010).  "If an affidavit

in support of a search warrant sets forth sufficient facts to lead a prudent person to

believe that there is a fair probability that contraband or evidence of a crime will be found

in a particular place, probable cause to issue the warrant has been established."  *United*

---

[1] Defendant's statements about the contents of the black Ford Focus are also encompassed within the public-safety exception.  In response to the officers' questions regarding the potential hazards present in the hotel, Defendant volunteered that such items were in the black Ford Focus.

*States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *accord Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."). The sufficiency of the affidavit is evaluated using a totality-of-the-circumstances approach. *United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011). "When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning." *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *1 (D. Minn. Mar. 14, 2011), *adopting report and recommendation*, 2011 WL 1060981 (D. Minn. Mar. 23, 2011). "Probable cause requires only a showing of fair probability, not hard certainties." *Hudspeth*, 525 F.3d at 676 (citing *Gates*, 426 U.S. at 213).

> When the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause. The affidavit should be examined under a common sense approach and not in a hypertechnical fashion. When the affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge is relevant to whether the affidavit provided probable cause to support the search.

*United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quotations and citations omitted). "Because reasonable minds may differ on whether a particular search-warrant

affidavit establishes probable cause, the issuing court's determination is accorded great deference." *Willis*, 2011 WL 1100127, at *2.

### 1. St. Paul Residence

The Court begins with the warrant to search Defendant's St. Paul residence. Detective Olson's affidavit states that, in June 2013, a cooperating individual ("CI"), who was known to her and has "extensive knowledge of the illicit drug trade," informed her that a person known to the CI as "Jimmy Cesario" is selling methamphetamine; Jimmy Cesario lives "at an address off Wakefield Ave" in St. Paul; and the CI has observed Jimmy Cesario with handguns in the past. (Ex. 1.) Detective Olson described how she showed the CI a driver's license photograph of Defendant, whose name is James Cesario, who the CI positively identified as Jimmy Cesario. (*Id.*) Detective Olson then described a controlled buy she conducted, using the CI to purchase methamphetamine from Defendant at his St. Paul residence on Wakefield Avenue. (*Id.*) The controlled buy involved the CI calling Defendant to order methamphetamine; a pre-buy search of the CI for narcotics or large sums of cash; providing the CI with pre-recorded buy money to make the purchase; and maintaining surveillance of the CI as the CI entered the St. Paul residence to make the purchase up through the CI's arrival at a predetermined meet location, where the CI provided Detective Olson with a substance which Defective Olson recognized as methamphetamine and field-tested positive as such. (*Id.*) The CI told Detective Olson that the methamphetamine was purchased from Defendant. (*Id.*) The warrant application and affidavit were provided to the state district court judge within 72

hours of the controlled buy. (*Id.*) Detective Olson also included Defendant's prior felony convictions and gang affiliations in her affidavit. (*Id.*)

Here, the CI was known to Detective Olson and provided some information that she was able to corroborate right away, including a positive identification of Defendant as the individual selling methamphetamine. *See United States v. Nolen*, 536 F.3d 834, 840 (8th Cir. 2008) ("[A] tip received from a known informant will more readily support a finding of probable cause."); *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) ("Even the corroboration of minor, innocent details can sufficient to establish probable cause." (quotation omitted)). Though not explicitly clear from the affidavit, it appears Detective Olson was also able to confirm that Defendant lived at the St. Paul residence as she states "your affiant conducted a controlled buy from [Defendant] from *his* residence of . . . Wakefield Ave, St. Paul." (Ex. 1 (emphasis added).) *See Tyler*, 238 F.3d at 1039.

More importantly, however, Detective Olson "independently corroborated the CI's information by arranging and monitoring a controlled buy from [Defendant's] residence." *Tripp*, 370 Fed. App'x at 758; *accord United States v. Pennington*, 69 F.3d 237, 742 (8th Cir. 2002) ("[B]y arranging and monitoring a controlled buy at Pennington's farm, the officers reliably corroborated the CI's information that Pennington was manufacturing and distributing methamphetamine at that location.").

Based on the foregoing, Detective Olson's affidavit contained sufficient information from which the state district court judge could conclude that there was a fair probability that contraband or evidence of a crime would be found at the St. Paul residence and the Court concludes that the warrant was supported by probable cause.

17

## 2.  Silver Chevrolet

In the affidavit supporting the search of the silver Chevrolet, Detective Olson discussed how the vehicle was stopped leaving the St. Paul residence as officers moved in to execute the search warrant for the St. Paul residence.  (Ex. 2.)  Detective Olson explained that Defendant was in the vehicle and "arrested on probable cause narcotics." (*Id.*)  Detective Olson stated that the vehicle was towed to a secure impound lot so that a canine sniff could be arranged.  (*Id.*)  Detective Olson also explained that a search of the residence uncovered "a stolen handgun, a quantity of narcotics[,] and currency."  (*Id.*)

Detective Olson then described the canine sniff conducted on the vehicle. Detective Olson averred that the dog "is a trained and certified narcotics detector dog," who is "trained to positively indicate to the odor of narcotics by sitting."  (*Id.*)  The dog is certified by the United States Police Canine Association.  (*Id.*)  Detective Olson specified several narcotics that the dog is trained to sniff for, including but not limited to methamphetamine.  (*Id.*)  Detective Olson then stated that the dog positively alerted at the driver's side door of the silver Chevrolet.  (*Id.*)

The Eighth Circuit has held that "a search warrant based on a drug dog's alert is facially sufficient if the affidavit states the dog is trained and certified to detect drugs." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999).

> A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable.  To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs.  An affidavit need not give a detailed account of the dog's track record or education.

*Id.* (citations omitted).   Here, the affidavit set forth enough facts for the state district court judge to conclude that the dog was reliable and thus supported a reasonable belief that there was a fair probability that contraband or evidence crime would be found in the silver Chevrolet.   *See id.*   Therefore, the Court concludes that the warrant to search the silver Chevrolet was also supported by probable cause.

### 3.   Buccal Swab

Detective Olson's affidavit in support of the buccal swab warrant began with the search of the St. Paul residence.   (Ex. 3.)   Detective Olson described how Defendant was stopped leaving the St. Paul residence and three other individuals were found inside the residence.   (*Id.*)   Detective Olson then detailed how a search of the St. Paul residence uncovered a stolen handgun as well as methamphetamine.   (*Id.*)   Detective Olson described Defendant's three prior felony convictions and gang affiliation. (*Id.*)   Detective Olson explained that a DNA sample from Defendant was necessary to compare with "any DNA that may be recovered from the [stolen handgun]" in investigating whether Defendant possessed the handgun.   (*Id.*)

While Detective Olson could have been clearer that the residence where the stolen handgun was found was also Defendant's residence—not just that Defendant was stopped leaving the residence, probable cause only requires a fair probability.   *See Hudspeth*, 525 F.3d at 676.   Common sense dictates that someone stopped leaving a residence in a personal vehicle, i.e., not a delivery van, likely lives at the residence or, at the very least, was recently in the residence.   The stolen handgun was found in the residence.   It is a crime for Defendant to possess a handgun based on his prior felony convictions.   18

U.S.C. § 922(g)(1) (prohibiting a person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" from possessing a firearm). Therefore, based on the totality of the circumstances, the Court concludes that the buccal swab warrant was supported by probable cause because there was a fair probability that the DNA evidence sought would yield evidence of a crime. *See Augustine*, 663 F.3d at 372; *Solomon*, 432 F.3d at 827; *United States v. Fletcher*, No. 11-cr-193 (DSD/AJB), 2011 WL 3837102, at *3 (D. Minn. Aug. 15, 2011) (DNA warrant supported by probable cause where "warrant properly and sufficiently identified the person and subject of the seizure and stated a nexus between the object of the warrant and the alleged offense in this case"), *adopting report and recommendation*, 2011 WL 3837092 (D. Minn. Aug. 30, 2011).

### 4.  Hotel Room

The next issue relates to the warrant to search the hotel room obtained in November 2013, approximately five months after the controlled buy and the search of the St. Paul residence.  (*See* Ex. 4.)  The affidavit in support of the warrant to search the hotel room discussed the information the CI gave Detective Olson back in June; Detective Olson's investigation of Defendant, including his criminal history and gang affiliation; the controlled buy; and the items found during the search of the St. Paul residence, including a large quantity of methamphetamine and the stolen handgun.  (*Id.*)

Detective Olson then stated that, in November, she became aware that Defendant was staying in Room 209 at the hotel.[2]  (*Id.*)  Detective Olson described how she pulled a rent roll from the hotel and confirmed that Defendant was staying in Room 209.  (*Id.*)  Detective Olson also stated that she "learned from *a* [cooperating individual] that [Defendant] is in possession of firearms and methamphetamine at [the hotel], Room 209."  (*Id.* (emphasis added).)  While Detective Olson testified at the hearing that the cooperating individual who provided the tip regarding Defendant's possession of firearms and methamphetamine at the hotel was the same person as the earlier CI, the affidavit does not convey this connection.  (*See id.*; Tr. at 30, 50.)

Detective Olson then describes a canine sniff conducted on the hotel premises. (Ex. 4.)  Detective Olson avers that the narcotics dog is certified through the United States Police Canine Association.  (*Id.*)  Detective Olson describes how the dog's handler had the dog sniff several doors in the hallway containing Room 209 and, when the dog sniffed the door to Room 209, the dog "immediately alerted to the odor of narcotics." (*Id.*)

As stated above, it is not clear from the affidavit that the cooperating individual providing information regarding Defendant's narcotics activities at the hotel was the same CI who had previously provided reliable information to Detective Olson. Nevertheless, Detective Olson was able to corroborate part of this cooperating individual's information with the hotel rent roll, making the tip as to the presence of

---

[2] In her testimony, Detective Olson stated that she learned Defendant was staying at a hotel. (Tr. at 31.)  The affidavit states that Defendant was staying at a motel. (Ex. 4.)  There is no argument that the warrant application and affidavit did not sufficiently specify the place to be searched.  The characterization of the motel as hotel by Detective Olson during her testimony is of no moment.  The Court refers to the motel as a hotel for consistency.

methamphetamine in Room 209 more reliable. *See Tyler*, 238 F.3d at 1039. The positive alert of the narcotics dog further corroborated the information Detective Olson received from the cooperating individual and itself provided probable cause for the presence of narcotics. *See Solomon*, 432 F.3d at 827; *Sundby*, 186 F.3d at 876.

Based on the foregoing, the Court concludes that the affidavit gave the state district court judge sufficient facts from which to conclude that there was a fair probability that contraband or evidence of a crime would be found in Room 209, and thus the warrant to search the hotel room was supported by probable cause.

### 5. Black Ford Focus

The last warrant Defendant challenges is the warrant to search the black Ford Focus. (Ex. 6.) The affidavit in support of this warrant began with a recitation of the same information contained in the warrant to search the hotel room with the exception of the canine sniff of Room 209. (*Id.*) The affidavit noted that a warrant was issued to search Defendant's hotel room. (*Id.*)

Turning to the black Ford Focus, Detective Olson averred that the vehicle is registered to Defendant and she has seen him drive it in the past. (*Id.*) Detective Olson stated that she and other officers were conducting surveillance on the hotel and they observed Defendant place two bags into the black Ford Focus. (*Id.*) Detective Olson then stated that later that day, when talking to Defendant, Defendant "made comments that he had firearms and narcotics in his vehicle parked in the area. [Defendant] made comments that a gun and illegal narcotics were in the black duffle bag." (*Id.*) Detective Olson repeated that "[she] knows that [Defendant] is a convicted felon and prohibited

from having firearms in his possession." (*Id.*)  Detective Olson averred that she and other officers found the black Ford Focus and the vehicle was towed to an impound lot. (*Id.*)

This warrant, like the others, is also supported by probable cause.  Detective Olson's affidavit contained sufficient information from which the state district court judge could conclude that there was a fair probability that contraband or evidence of a crime would be found in the black Ford Focus.

### 6. *Leon* Good-Faith Exception

Assuming *arguendo* that the affidavits just discussed failed to establish probable cause for the respective warrants, "the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered." *Willis*, 2011 WL 1100127, at *3.  "Under *Leon*, the exclusionary rule is not to be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral [judge's] determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quotation omitted).  "Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Gibson*, 928 F.2d 250, 254 (8th Cir. 1991).  "If a warrant is 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' an officer's reliance on the warrant cannot have been in good faith." *United States v. Goody*, 377 F.3d 834, 836 (8th Cir. 2004) (quoting *Leon*, 468 U.S. at 923 (internal quotation marks omitted)).  The court's inquiry is confined "to the objectively ascertainable question of whether a reasonably

well trained officer would have known that the search was illegal despite the issuing judge's authorization." *Hudspeth*, 525 F.3d at 676 (quotation omitted).

Here, Detective Olson and the officers "acted in objectively reasonable reliance" on the warrants issued by the state district court judges. *Gibson*, 928 F.2d at 253 (citing *Leon*, 468 U.S. at 922); *accord Goody*, 377 F.3d at 836 ("[W]e see nothing to indicate that the officers did not act with objective good faith on the [issuing judge's] probable-cause determination."). There is nothing to indicate that the state district court judges were anything other than neutral and detached when evaluating the warrant applications. *See Keele*, 589 F.3d at 944. There is nothing to indicate that Detective Olson was dishonest or reckless in preparing the affidavits. *See Gibson*, 928 F.2d at 254 ("Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth."). Finally, none of the affidavits were so facially lacking in probable cause as to preclude reasonable reliance on them. *See Hudspeth*, 525 F.3d at 676; *Gibson*, 928 F.2d at 254.

In sum, the Court finds that probable cause existed to support each of the warrants in question and, even if probable cause did not exist, the *Leon* good-faith exception would apply. Therefore, the Court recommends that Defendant's motion to suppress the fruits of the various searches be denied.

**III.**

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate

Judge makes the following:

**RECOMMENDATION**

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Statements (ECF No. 22) be
   **DENIED**.

2. Defendant's Pretrial Motion to Suppress Fruits of Unlawful Arrest and
   Search and Seizure (ECF No. 23) be **DENIED**.

Date: June ___30___, 2014                              _____s/ Tony N. Leung_____
                                                       Tony N. Leung
                                                       United States Magistrate Judge
                                                       for the District of Minnesota

                                                       *United States v. Cesario*
                                                       File No. 14-cr-92(1) (PJS/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and

Recommendation by filing with the Clerk of Court, and by serving upon all parties,

written objections which specifically identify the portions of the Report to which

objections are made and the bases for each objection. This Report and Recommendation

does not constitute an order or judgment from the District Court and it is therefore not

directly appealable to the Circuit Court of Appeals. Written objections must be filed with

the Court before **July 15, 2014**.